The State of **WYOMING,**
et al., **Plaintiffs,**

v.

**UNITED STATES of America,**
et al., **Defendants,**

and

**Jackson Hole Conservation Alliance,**
et al., **Intervenor–Defendants.**

No. 98–CV–037B.

United States District Court,
D. Wyoming.

Aug. 24, 1999.

Gay Vanderpoel Woodhouse, Wyoming Attorney General, Ronald P. Arnold, Assistant Wyoming Attorney General, Lynda G. Cook, Assistant Wyoming Attorney General, Cheyenne, WY, for plaintiff.

Kenneth E. Kellner, Department of Justice., Washington, DC, for defendant.

Alan B. Minier, Rothgerber Johnson & Lyons, Cheyenne, WY, James S. Angell, Earthjustice Legal Defense Fund, Bozeman, MT, for interveners.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING ALL OTHER PENDING MOTIONS AS MOOT

BRIMMER, District Judge.

This matter comes before the Court on several motions: Defendants' Motion to Dismiss, Intervenor–Defendants' Motion to Dismiss Count One of the Amended Complaint and Motion for Summary Judgment, and Plaintiffs' Motion for Summary

Judgment and for a Preliminary Injunction. The Court, after reading the briefs, hearing oral arguments, and being fully advised of the premises, **FINDS** and **ORDERS** as follows:

### INTRODUCTION

This case is the result of a dispute between the State of Wyoming ("Wyoming") and the United States Fish and Wildlife Service ("FWS") over the proper management of brucellosis on the National Elk Refuge ("Elk Refuge") outside of Jackson, Wyoming. Brucellosis is a bacterial borne pathogen, strains of which may infect the mammary glands and reproductive tracts of many undulants, including elk and cattle. Brucellosis often results in spontaneous abortions among newly infected animals. This contagious disease is spread when infected animals come into contact with uninfected animals. Studies are inconclusive whether the disease is spread between species, such as from elk to cattle, or vice versa. The efficacy of vaccinating elk against brucellosis with a cattle-specific vaccine is also disputed.

In the winter, Wyoming vaccinates elk against brucellosis on several state-operated feeding grounds. Wyoming filed this lawsuit when the FWS refused to allow Wyoming Game and Fish personnel to enter the Elk Refuge for the purpose of vaccinating elk. Wyoming argues that although the Elk Refuge is Federal public land, it is nevertheless entitled to vaccinate the elk on the Refuge regardless of whether the FWS objects to this type of management.

In July 1998, the Court granted Plaintiffs leave to amend their Complaint in order to clarify the scope of the claims and jurisdictional bases contained therein.[1] Based upon the Amended Complaint and the competing motions for summary judgment, the parties have conceded that this dispute is properly decided on the motions before the Court. Although the parties

disagree as to the efficacy of the FWS's and Wyoming's respective brucellosis management plans, that dispute does not prohibit the resolution of this case on the motions. The Court need not, and indeed should not, address that issue in this order. The Court thus turns to the pending motions to dismiss and motions for summary judgment.

### STANDARD FOR MOTIONS TO DISMISS

When considering a party's motion to dismiss, all well-pleaded factual allegations in the Amended Complaint are accepted as true and viewed in the light most favorable to the nonmoving party. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). In a 12(b)(1) motion to dismiss, the Court considers whether the complaint, standing alone, is legally sufficient to state a claim upon which relief may be granted. *See Swoboda v. Dubach*, 992 F.2d 286, 288 (10th Cir.1993). The standards used to judge a motion to dismiss brought under 12(b)(6) are slightly different: a 12(b)(6) motion "should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *See GFF Corp.*, 130 F.3d at 1384 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court must convert a Rule 12(b)(1) motion to one under Rule 12(b)(6), or for summary judgment, "[i]f the jurisdictional question is intertwined with the merits of the case." *Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir.1997).

### I. Federal Defendants' Motion to Dismiss

Defendants argue that Plaintiffs' cause of action should be dismissed for many reasons: (1) Plaintiffs do not have stand-

---

1. Although the Amended Complaint far surpasses the original Complaint in length, it has not substantially assisted the Court in clarifying Plaintiffs' position. After another round

of briefing and argument, however, the Court is confident that it has discerned the nature of Plaintiffs' claims and will proceed accordingly.

ing, (2) Defendants have not waived sovereign immunity, (3) Plaintiffs do not fall within the zone of interests of the statute under which they seek relief, (4) Plaintiffs fail to state a claim for which relief may be granted, and (5) Defendants' actions were committed to agency discretion and are unreviewable. The Court will address these arguments in turn.

## A. Article III Standing

■ For the Court to hear this case, the plaintiffs must have standing. To satisfy the standing requirement of Article III, the plaintiffs must demonstrate all the following factors:

(1) that the plaintiff[s] have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2) that there [is] a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and

(3) that it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351, (1992)).

■ Neither the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, nor any other congressional enactment can lower the Article III standing threshold. *Lujan*, 504 U.S. at 576, 112 S.Ct. 2130. Plaintiffs have the burden to establish jurisdiction by clearly alleging facts demonstrating that they are "a proper party to invoke judicial resolution of the dispute." *United States v. Hays*, 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995).

■ Plaintiffs have met this burden. First, Plaintiffs sufficiently have alleged that they have suffered an injury-in-fact.

Plaintiffs allege that the FWS's refusal to vaccinate elk against brucellosis has reduced the efficacy of Wyoming's own vaccination efforts among the resident elk population of Wyoming. Second, Plaintiffs have alleged a causal connection between their injury—a less effective vaccination program—and Defendants' conduct—refusal to vaccinate or allow vaccination on the Elk Refuge. Finally, Plaintiffs have alleged that their injury would be redressed by a favorable outcome in this suit. Plaintiffs' allegations, accepted as true, are sufficient to show that requiring the defendants to allow a state-run vaccination program on the Elk Refuge would reduce the transmission of brucellosis among the resident elk population and improve the efficacy of the state's vaccination program.

Because Plaintiffs have demonstrated constitutional standing, the Court now moves to the individual counts of Plaintiffs' Complaint. The Court must determine whether it has jurisdiction to hear Plaintiffs' claims and whether Plaintiffs have stated claims upon which relief may be granted.

## B. Count 1: Impingement on State Sovereignty

■ As the Court understands the first Count, Plaintiffs claim that Defendant Babbitt's decision to prohibit Wyoming from conducting a vaccination program on the Elk Refuge is ultra vires and contrary to congressional intent. Babbitt's prohibition of a Wyoming-run vaccination program on the Elk Refuge reduces the efficacy of Wyoming's own vaccination program and impinges on its sovereign authority to manage its resident wildlife population. Plaintiffs argue that Wyoming has authority to manage resident wildlife on the Elk Refuge because the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. § 668dd *et seq.* ("Refuge Act"), neither implicitly nor explicitly preempts the State from doing so.

■ Before the Court reaches the merits of Plaintiffs' claims, it must determine if it has jurisdiction. Plaintiffs have the burden of establishing jurisdiction in this Court. *See United States v. Bustillos,* 31 F.3d 931, 933 (10th Cir.1994). The first question a Court must ask when confronted with a suit against the Federal Government is whether the Government has waived sovereign immunity. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, ——, 119 S.Ct. 687, 690, 142 L.Ed.2d 718 (1999). "The States of the Union, like all other entities, are barred by federal sovereign immunity from suing the United States in the absence of an express waiver of this immunity by Congress." *Block v. North Dakota,* 461 U.S. 273, 280, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). By passing statutes that include waiver provisions, Congress has waived its immunity for several types of suits. *See Blue Fox,* 525 U.S. at ——, 119 S.Ct. at 691, 142 L.Ed.2d 718. However, any waiver of governmental immunity must be narrowly construed in favor of the sovereign; a waiver of immunity will not be implied. *See Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996).

■ Plaintiffs have the burden to show that the Federal Government has waived sovereign immunity. *See Fostvedt v. United States,* 978 F.2d 1201, 1203 (10th Cir. 1992). Here, Plaintiffs do not identify an unequivocal waiver of immunity in Count I. Instead, Plaintiffs identify several alternative grounds for jurisdiction in general. The Court will consider each statute mentioned by the plaintiffs so to determine whether the statute waives sovereign immunity.

■ Plaintiffs argue that 28 U.S.C. § 1331 confers jurisdiction upon the Court because Plaintiffs have filed claims that implicate federal questions. While it may be true that Plaintiffs' claims involve federal questions, the existence of a federal question does not necessarily constitute a waiver of sovereign immunity. Section 1331 merely establishes a subject matter that is within the competence of federal courts to entertain; it does not waive the Federal Government's sovereign immunity. *See Fostvedt,* 978 F.2d at 1203. This tenet holds true regardless of whether Plaintiffs bring this cause of action under a federal statute or federal common law.[2] Again, a waiver of governmental immunity must be express; it will not be implied. *See id.*

■ Plaintiffs also mention the Declaratory Judgment Act, 28 U.S.C. § 2201, in their Amended Complaint. However, this statute does not act as a waiver of sovereign immunity. *See Schulke v. United States,* 544 F.2d 453, 455 (10th Cir.1976). In addition, Plaintiffs have failed to point to any provisions in the Refuge Act that act as an explicit waiver of sovereign immunity. The only other statute mentioned in Plaintiff's first two Counts of the Complaint is Wyoming's "Enabling Act," 26 Stat. 222 (July 10, 1890). The Court cannot conceive that any provisions of this statute that act as a waiver of sovereign immunity.[3]

In sum, Plaintiffs have not shown that the Federal Government has waived sovereign immunity with regard to the claims contained in Count I of the Amended Com-

---

**2.** The Court notes that it can find no instances of the federal common law of "wildlife management." No such judicially-created doctrine appears to exist.

**3.** The relevant provisions of Wyoming's Enabling Act state as follows:

That the state of Wyoming is hereby declared to be a state of the United States of America, and is hereby declared admitted into the Union on an equal footing with the original states in all respects whatever; and that the constitution which the people of Wyoming have formed for themselves be, and the same is hereby, accepted, ratified, and confirmed.

Act of Admission, 26 Stat. 222 (July 10, 1890).

Nothing in this language constitutes a waiver of federal sovereign immunity.

plaint. As a result, this Count must be **DISMISSED**. Defendants' Motion to Dismiss Count I is **GRANTED**.

## C. Count II: Tenth Amendment Infringement

■ As the Court understands this Count, Plaintiffs argue that Defendants have violated the Tenth Amendment through their prohibition of a State-run vaccination program on the Elk Refuge. According to Plaintiffs, the State of Wyoming has inherent sovereign authority to manage wildlife within its borders. Defendants have severely restricted Wyoming's traditional police power of controlling diseases in its wildlife and domestic animals. Plaintiffs argue that any statute, regulation, or inaction by Defendant Babbitt that preempts Wyoming from controlling wildlife diseases is in direct conflict with the Tenth Amendment because (1) Wyoming's integrity in controlling wildlife diseases is compromised, and (2) Wyoming cannot efficiently function in the interstate movement of either its wildlife or its domestic animals without special restrictions placed upon the state due to fear of brucellosis transmission.

■ Regardless of the merits of Plaintiffs' claims, Plaintiffs' second Count must fail for the same reason as its first: The defendants have not consented to be sued in this manner. Although logically counterintuitive, the Constitution itself does not provide a waiver of immunity against the Federal Government.[4] As stated above, absent congressional legislation explicitly waiving immunity, the defendants cannot be sued.[5] Consequently, Plaintiffs' second Count must fail.

However, even if the Court were to find that Defendants had somehow waived immunity, Plaintiffs' second Count would fail for failure to state a claim upon which relief may be granted.

■ The Tenth Amendment protects States from intrusion by the federal government by providing that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Here, Plaintiffs have not shown that the Defendants are infringing upon any rights reserved to the States by the Tenth Amendment. The Property Clause of the Constitution, Article IV, § 3 "permit[s] an exercise of the complete power which Congress has over particular public property entrusted to it ... [and that] necessarily includes the

---

4. *See Garcia v. United States,* 666 F.2d 960, 966 (5th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982) (holding that 28 U.S.C. § 1331 and U.S. Constitution do not waive government's sovereign immunity); *Jaffee v. United States,* 592 F.2d 712, 715–18 (3d Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979) (holding that the Constitution does not waive the Government's sovereign immunity in a suit for damages).

5. Granted, the doctrine of sovereign immunity is not always applicable to suits filed against federal entities or officials. *See Kelley v. United States,* 69 F.3d 1503, 1507 (10th Cir.1995). In particular, one of the well-established exceptions to the doctrine limits its application in declaratory and/or injunctive suits against federal entities or officials seeking to enjoin the enforcement of an unconstitutional statute. *See, e.g., Dugan v. Rank,* 372 U.S. 609, 621–22, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Tenneco Oil Co. v. Sac*

*and Fox Tribe,* 725 F.2d 572, 574 (10th Cir. 1984). However, this is not the case here. Plaintiffs are not arguing that the federal defendants are enforcing an unconstitutional statute, but are misapplying or acting outside the scope of a perfectly legal statute.

Consequently, the agencies and officers sued in their official capacities are generally protected by the same sovereign immunity afforded the United States. *See FDIC v. Meyer,* 510 U.S. 471, 474–76, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Brandon v. Holt,* 469 U.S. 464, 471–472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.); *Monell v. New York City Dept. of Soc. Serv.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.).

power to regulate and protect the wildlife there." *Kleppe v. New Mexico*, 426 U.S. 529, 540–41, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). Thus, the allegations in Plaintiffs' second Count do not involve any powers reserved by the Tenth Amendment since *Kleppe* provides that the authority to regulate wildlife on federal public lands was not a power left to the several States. Count II thus fails to state a claim upon which relief may be granted.

Nevertheless, Plaintiffs argue that the Article IV Property Clause does not affect the viability of their Tenth Amendment claim. According to Plaintiffs, only powers enumerated to Congress in Article I of the Constitution are protected. Plaintiffs apparently argue that the Court should view this Tenth Amendment question from the perspective of "powers delegated to the Federal Government" as opposed to "powers reserved to the several States."

However, according to the Supreme Court, it makes no difference whether one views the question as "one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment." *New York v. United States*, 505 U.S. 144, 159, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The end result is the same. Further, the Supreme Court, in *Kleppe*, determined that managing wildlife on federal land was not a power reserved to the States; it was taken by the Federal Government under the auspices of the Property Clause. Simply put, Wyoming does not have the sovereign power to manage wildlife on Federal lands and the provisions of the Refuge Act do not grant Wyoming that

power. Plaintiffs' Tenth Amendment claim thus fails.

In sum, Plaintiffs have not shown (1) that Defendants waived sovereign immunity in order to confer jurisdiction upon this Court, or (2) that Count II states a claim upon which relief can be granted. Defendants' Motion to Dismiss Count II is **GRANTED** and Count II of the Amended Complaint is necessarily **DISMISSED**.

### D. Count III: Review of Agency Action

■ Plaintiffs' third Count, plead in the alternative, asks this Court for a review of agency action under the provisions of the Administrative Procedure Act, 5 U.S.C. § 703. But before the Court may address these claims, it must satisfy itself that Plaintiffs have standing to petition for review. Although the Court has already determined that Plaintiffs meet the Article III standing requirements, the Court also must ascertain whether Plaintiffs meet prudential standing requirements.[6]

#### 1. Prudential Standing: Zone of Interests Test

■ To meet the prudential standing requirements of the APA, Plaintiffs must show there has been some "final agency action"[7] and must "demonstrate that [their] claims fall within the zone of interests protected by the statute forming the basis of [their] claims." *Catron County Bd. of Comm'rs v. United States Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir.1996). "There must be some indicia—however slight—that the litigant before the court was intended to be protected, benefitted or regulated by the statute under which suit is brought." *Liquid Car-*

---

6. Congress may enact a statute that eliminates the prudential inquiry, thereby making review available to any party that establishes standing under Article III. However, Congress did not eliminate the prudential standing barrier when it authorized judicial review under the APA. *See Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 394–96, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

7. The Court will assume, for the purposes of this Order, that Plaintiffs' Amended Complaint has demonstrated final agency action by showing that Defendant Babbitt denied Wyoming "its sovereign authority to manage and control brucellosis in elk." (Am. Compl.¶ 48.) Under the APA, "agency action includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

*bonic Indus. Corp. v. Federal Energy Regulatory Comm'n,* 29 F.3d 697, 704 (D.C.Cir.1994) (citations omitted). Whether Plaintiffs' claims fall "within the meaning of the zone-of-interests test is to be determined ... by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1167, 137 L.Ed.2d 281 (1997) (internal quotation marks and citations omitted). However, the test precludes review of administrative action if the particular interest asserted is "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Assoc.,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

Keeping these guidelines in mind, the Court must first determine if Congress intended Plaintiffs to be "protected, benefitted or regulated" by the Refuge Act. The stated mission of the National Refuge System created by the Act is to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2) (1997).

The provision of the Refuge Act upon which Plaintiffs rely states:

> Nothing in this Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System. Regulations permitting hunting or fishing of fish and resident wildlife within the System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans.

16 U.S.C. § 668dd(m).

It is undisputed that Congress did not intend to "regulate" Plaintiffs by the Refuge Act. A closer question presents itself,

however, when determining whether Congress meant to "protect" or "benefit" Plaintiffs by the Act. As stated above, the mission of the Refuge Act is to provide a national network of lands whereby wildlife can be managed and preserved for future generations. According to this mission statement, Plaintiffs' interests do not appear to be among those that Congress intended to protect or benefit through the Refuge Act. In fact, Plaintiffs' alleged sovereign interest in managing wildlife appears to be at odds with the Refuge Act's mission of creating a "national network" of management. Allowing each state to manage wildlife on the national refuges within its borders would thwart the goal of creating a nationwide network of lands to be managed by one entity. Consequently, the Court is initially inclined to hold that Plaintiffs do not fall within the zone of interests contemplated by the Refuge Act.

However, the zone of interests test is not meant to be especially demanding; there need be no indication of congressional purpose to benefit the would-be plaintiff. *See Clarke,* 479 U.S. at 399, 107 S.Ct. 750. As cited by Plaintiffs, the Refuge Act's "saving clause," *see* 16 U.S.C. § 668dd(m), indicates that the Refuge Act was not meant to affect the authority of the States to manage resident wildlife within the Refuge System. If the Court focuses merely on this provision, then Plaintiffs' desire to manage wildlife arguably falls within the zone of interest protected by the statute. Because the test, especially in relation to the APA, is not meant to be especially demanding, the Court hesitatingly finds that Plaintiffs fall within the zone of interests of the Refuge Act.

The Court's analysis does not end here, however. Plaintiffs still must establish that the Court has jurisdiction over their APA claim. The jurisdictional basis paragraph in Plaintiffs' Amended Complaint relies upon 5 U.S.C. § 703. However, this provision does not provide jurisdiction or constitute a waiver of sovereign

immunity. *See Lonsdale v. United States,* 919 F.2d 1440, 1444 (10th Cir.1990); *see also Motah v. United States,* 402 F.2d 1 (10th Cir.1968) (holding that the APA does not waive sovereign immunity in an action involving the Secretary of the Interior). Likewise, the waiver of sovereign immunity found at 5 U.S.C. § 702 does not provide jurisdiction where none exists on other grounds. *See Lonsdale,* 919 F.2d at 1444. Simply put, the APA is not a grant of jurisdiction for the review of agency actions. *See Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Plaintiffs must have some other basis for which to bring a claim for it to be reviewable pursuant to the APA. As the Court explains below, Plaintiffs have shown no such basis; the Court has no jurisdiction to hear Plaintiffs' claims because they fail to state a claim upon which relief may be granted.

### 2. The Refuge Act Does Not Give Wyoming Mutual Rights to Manage Wildlife on Federal Lands

Plaintiffs argue that the Court may hold unlawful Defendant Babbitt's ultra vires actions found to be not in accordance with law and in excess of statutory limitation. (Am.Compl.¶ 56.) The crux of Plaintiffs' claims is that Wyoming has "sovereign authority" to manage and control wildlife on the Elk Refuge. Thus, Plaintiffs contend that Defendant Babbitt's actions infringing upon that authority are ultra vires. The Court agrees that § 706(2)(A) and (C) of the APA allow the Court to review ultra vires actions. However, for the reasons stated below, the Court finds that Defendant Babbitt did not act in excess of his authority: Wyoming does not have mutual rights to manage wildlife on the Elk Refuge.

Plaintiffs rely almost exclusively on the Refuge Act's "saving clause," *supra,* as evidence that Congress intended to leave the "sovereign authority" to manage wildlife on the Refuges with the States. However, as discussed in Section C, the States do not have sovereign authority to manage wildlife on Refuge lands. The Property Clause gives the Federal Government complete power over particular public property that Congress has entrusted to it. *See Kleppe,* 426 U.S. at 540, 96 S.Ct. 2285. This "complete power ... necessarily includes the power to regulate and protect the wildlife living there." *Id.* at 540–41, 96 S.Ct. 2285. Thus, Wyoming does not have "authority, jurisdiction, or responsibility" to manage elk on the Refuge. To interpret the decision of the Secretary that is being challenged in this matter as "affecting" such "authority, jurisdiction, or responsibility" would be erroneous. 16 U.S.C. § 668dd(m).

Even if the Court were to find that Plaintiffs, at one time, possessed the sovereign authority to manage wildlife on federal lands (which the Court does not), Plaintiffs no longer possess such authority because the Refuge Act grants the authority to manage wildlife on refuge lands to the Secretary of the Interior. Congress has intended, through the sweeping and general language of the Refuge Act, to vest such authority in the Secretary. The "scheme of federal regulation is so comprehensive [in this case] as to make it a reasonable inference that Congress intended to occupy the field." *See United States v. City and County of Denver,* 916 F.Supp. 1058, 1062 (D.Colo.1996). Several provisions of the Refuge Act express Congress's intention in this regard. But before the Court launches its statutory analysis, it must briefly review the general rules of statutory interpretation.

■■■ In interpreting statutes, the Court begins with the relevant language. *See Leonhardt v. Western Sugar Co.,* 160 F.3d 631, 635 (1998). "If congressional will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Id.* (quotation marks and citation omitted). The Court does not, however, read specific statutory language in isolation. The Court "must look to the particular statutory language at issue, as well as the language and design

of the statute as a whole." *Id.* (quotation marks and citations omitted).

Congress created the National Wildlife Refuge System for the "purpose of consolidating the authorities relating to the various categories of areas that are administered by the Secretary for the conservation of fish and wildlife, . . . including . . . all lands, waters, and interests therein administered by the Secretary . . ." through the FWS. 16 U.S.C. § 668dd(a)(1). The mission of the Refuge System is to "administer a national network of lands and waters for the conservation, *management,* and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States." 16 U.S.C. § 668dd(a)(2) (emphasis added). Through these provisions, Congress undoubtedly envisioned a nationwide, cohesively administered network of lands · and waters where wildlife would be managed and conserved under the direction of the Secretary. There is no indication in these provisions that Congress intended to curtail the Secretary's power or leave any residual power to the States.

Congress also provided that in administering the Refuge System, "the Secretary *shall,*" "provide for the conservation of . . . wildlife," and "ensure the biological integrity, diversity, and environmental health of the System." 16 U.S.C. § 668dd(a)(4) (emphasis added). The Secretary is also authorized, "under such regulations as he may prescribe, to . . . permit the use of

any area within the System for any purpose, including but not limited to hunting, fishing, . . . and access whenever he determines that such uses are compatible with the major purposes" of the Refuge System. 16 U.S.C. § 668dd(d)(1)(A). To give teeth to the Secretary's power to limit activities on refuge lands, Congress made it criminal for any person to knowingly "enter, use, or otherwise occupy any such area for any purpose; unless such activities are performed by persons authorized to manage such area." 16 U.S.C. § 668dd(c).

▮▮▮▮ To the Court, this broad language surely indicates that Congress meant to give the Secretary complete administrative and management authority over national refuges. For example, Section (d)(1)(A) indicates that the Secretary has sole discretion to decide who may have access to the Elk Refuge and what activities may be conducted there.[8] When this language is given its full and expansive plain meaning, it is evident that Congress left little room for any other entity to exert management control over national refuges.[9] Indeed, the Court cannot conceive how a program to vaccinate elk on a national refuge would not fall within the scope of the Secretary's duties of "conservation of fish and wildlife," § 668dd(a)(1), "conservation [and] management . . . of. fish, wildlife and plant resources and their habitats," § 668dd(a)(2), or providing for the "biological integrity, diversity, and en-

---

**8.** This section alone supports the position that Defendant Babbitts' actions were not ultra vires; the Secretary had discretion to decide what activities may be conducted on the Refuge.

**9.** Although the Refuge Act most commonly uses the words "administer" instead of "manage" when ' referring to the responsibilities and powers of the Secretary, the Court finds this of little consequence. "Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." *Pioneer Inv. Servs. Co. v. Brunswick Assoc.,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).

This Court finds, as have many others, that the common meaning of the word "administer" is "to manage the affairs of . . . ." *See, e.g., Webster's Third New International Dictionary* 27 (1971); *see also Trustees For Alaska v. Watt,* 524 F.Supp. 1303, 1308 (D.Alaska 1981) (finding that "administer" means "to manage the affairs of"). There is little merit to an argument that Congress meant, through its use of the word "administer," that the Secretary may only passively administer refuge lands. The Court finds that Congress intended, through the Refuge Act's expansive language, that the Secretary (under the guise of the FWS) actively manage refuge lands and the flora and fauna contained therein.

vironmental health of the System." 16 U.S.C. § 668dd(a)(4)(B).

The "saving clause" relied upon by Plaintiffs does not alter the conclusion that the Secretary has complete authority to manage the wildlife on national refuges. Again, that provision, entitled "State authority," provides:

Nothing in this Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System. Regulations permitting hunting or fishing of fish and resident wildlife within the System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans.

16 U.S.C. § 668dd(m).

██ First, to interpret this provision as allowing the mere existence of a State statute or regulation to dictate policies and activities on a federal refuge, where Congress has already carefully crafted a system for its administration by the Secretary, would be at odds with the vast majority of the Refuge Act's other provisions. It is a well accepted rule of statutory interpretation that the provisions of a statute should not be interpreted in a manner that renders one part of the statute inoperative. *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985). In this case, adopting Plaintiffs' interpretation of the "State authority" provision would render a large part of the Refuge Act inoperative.

A more reasonable interpretation of the "saving clause" is that it reflects a Congressional intent for states to retain their role as primary managers of hunting and fishing of resident wildlife within their bor-

ders as consistent with federal law. The second sentence of § 668dd(m) lends credence to this interpretation when it directs that regulations promulgated by the Secretary "permitting hunting or fishing of fish and resident wildlife within the System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans." Indeed, this second sentence supports the proposition that Congress intended the Secretary's authority to be paramount—the Secretary only needs to be consistent with State law "to the extent practicable."

Plaintiffs' exclusive reliance upon the first sentence of this provision is misplaced. They cannot latch on to one sentence of an entire statute and ignore the rest, especially when the remainder of the statute (indeed, even the remainder of their specific provision) strongly supports a contrary position. The Court's interpretation of the "State authority" provision gives it a meaning consistent with the entire Refuge Act, a result dictated by principles of statutory interpretation.

██ Plaintiffs also argue that Congress intended, by the savings clause, to maintain the "status quo" with regard to management authority on the Refuge. The status quo, according to Plaintiffs, was that the States traditionally managed the wildlife, even on federal lands. (Pl. Opp.Mot.Dis. at 15.) Plaintiffs refer the Court to the legislative history associated with the provision that would ultimately become 16 U.S.C. § 668dd(m).[10] They cite the following language:

This amendment added a new provision to section 4(c) of the House bill stating that this legislation shall not be construed to affect the authority, jurisdiction, or responsibility of the States relating to fish and resident wildlife in any

---

**10.** In addition to an analysis of the statutory language itself, courts often look to the purpose and intent of a statute when deciding what its terms mean. *See United States v. Shewmaker,* 936 F.2d 1124, 1127 (10th Cir. 1991). Although a court should not refer to the legislative history of a statute if the statutory language is unambiguous, the Court finds the language of the saving clause sufficiently ambiguous to warrant a review of the history surrounding it. *See United States v. Simmonds,* 111 F.3d 737, 742 (10th Cir.1997).

area within the National Wildlife Refuge System. This provision is designed to maintain the status quo with respect to the dispute between the States and the Department of the Interior over the issue of which entity has authority to regulate fish and resident wildlife in such areas. Both parties to the dispute have agreed that it does maintain the status quo. It will permit them to resolve the dispute through future negotiations. (Pl.Opp.Mot.Dis. at 15.)

Although the Plaintiffs argue that the legislative history cited above supports their position, the Court finds the opposite to be true. Granted, this language refers to maintaining the "status quo." However, the status quo refers not to the authority of the several States to manage wildlife on federal lands, but to the *dispute* that state agencies and the Department of Interior had over which entity should manage the wildlife in these areas. Congress acknowledged that dispute. So, rather than shifting the authority over federal lands away from the federal government, Congress intended to "maintain the status quo relative to the dispute," so as to permit the parties involved in the dispute "to negotiate and resolve the problem at a future date." S.Rep. No. 1463 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3348. Other areas of the legislative history also indicate that the "status quo" was not that the States traditionally managed wildlife:

> The Department's position is set forth in the Solicitor's 1964 opinion which is printed in the Senate hearings on S.2217. The State's position is set forth in their brief which is on file in the offices of this committee and available for public review. Both parties have agreed that this language does not change either the State's or Solicitor's position.
> S.Rep. No. 1463 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3348.

The aforementioned opinion of the Solicitor of the Department of the Interior recognizes the "broad Federal power to regulate and manage species of wildlife on Federally owned land, which is derived from the Federal Constitution and the inherent powers of the Federal Government as a landowner, [and] vested in the Secretary of the Interior" by law. *Authority of the Secretary of the Interior to Manage and Control Resident Species of Wildlife Which Inhabit Wildlife Refuges Under the Administration of the Secretary,* 71 I.D. 469, 473 (1964).

Congress recognized the ongoing conflict between the state and federal entities and encouraged the parties, in the language of the Refuge Act, to negotiate a resolution to their disputes. For example, Congress directed the Secretary to "ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges and the fish and wildlife agency of the States in which the units of the System are located." 16 U.S.C. § 668dd(a)(4)(E). Nowhere in this language does Congress indicate that the States either have or retain a sovereign right to manage wildlife on federal lands. Congress recognized an ongoing dispute between the entities and instructed the Secretary to work cooperatively to resolve any disputes to the extent practicable.[11] Neither this Congressional instruction nor the saving clause require the Secretary to yield to the management policies of the States. To so read the Refuge Act would violate both its plain language and intent.

Thus, Congressional timidity has legislated another Federal–State standoff. The intransigence of the Secretary trumps the well-intentioned efforts of the State to solve the brucellosis problem in elk. Only the poor, dumb creatures of the wild suffer as this disease spreads while the FWS dithers over whether Wyoming's vaccination program has imperfections. That Wyoming's program may not be perfect is not a sine qua non, but it at least is moving forward to do something about a serious,

---

11. This language implies that when coordination between entities is no longer practicable, the Secretary may cease his attempts at coordination.

spreading wildlife disease. The Court is sorry that this patchwork of federal law gives the Secretary room to play out his stalling game while doing nothing.

■ Sadly, the Refuge Act does not give Wyoming mutual rights to manage wildlife on the National Elk Refuge,[12] and to read either the text of the Act or its legislative history in such a way would be improper. Because the Refuge Act does not give Plaintiffs a right to manage wildlife on the Elk Refuge, the Court can fashion no remedy and has no jurisdiction over their claims. Plaintiffs have failed to state a claim upon which relief may be granted.[13] Defendants' motion to dismiss Count III is thus **GRANTED**. Count III of Plaintiffs' Amended Complaint is **DISMISSED**.

### CONCLUSION

The Court is sympathetic to Plaintiffs' claims. Brucellosis is an insidious disease, rapidly spread and damaging to both wild and domestic animals. The State of Wyoming is trying to eradicate the disease in elk by conducting vaccination programs on state feeding grounds. The refusal of the Fish and Wildlife Service to allow a state-run vaccination program on the Elk Refuge—and the unwillingness of the FWS to conduct its own program—must be terribly frustrating to the Plaintiffs.

However, the claims Plaintiffs present and the relief they seek are not within the province of this Court. Defendants have not waived sovereign immunity with regard to Plaintiffs' first two Counts. In addition, Plaintiffs' third Count does not state a claim because the Refuge Act does not provide for mutual management rights of wildlife on federal lands. Based upon the pleadings before this Court, the Court cannot order Defendants to allow the State of Wyoming to conduct a brucellosis vaccination program on the Elk Refuge. Neither the Constitution, Congressional statutes, nor sound policy considerations warrant a different result. Although these words may ring hollow for the Plaintiffs, the Court strongly urges both the Federal and State actors involved in this suit to take seriously the spirit of cooperation expressed by Congress in the Refuge Act.

Federal Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is thus **GRANTED**. Plaintiffs' claims are necessarily **DISMISSED** in their entirety. Plaintiffs' Motion for Summary Judgment and Motion for a Preliminary Injunction are **DENIED** as moot. Intervenor–Defendants' Motion to Dismiss Count One of the Amended Complaint and Motion for Summary Judgment[14] are also **DENIED** as moot.

---

**12.** The Court notes that this fact would also spell the demise of Plaintiffs' first two Counts, if the Court had not already dismissed them on other grounds.

**13.** Because the Court is dismissing Count III on this ground, it need not address Defendants' other arguments as to why the Amended Complaint warrants dismissal. However, the Court wishes to state that Count III would also fail because the Court has no meaningful standard with which to review the Secretary's actions in this matter. Nothing in the Refuge Act compels the Secretary to permit the action requested in the instant case, and the APA does not confer jurisdiction or allow review of agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Without substantive standards

against which to judge an agency's exercise of discretion, the Court's review would be nothing more than a random assessment of the fairness of agency action. *See Community Action v. Bowen*, 866 F.2d 347, 354 (10th Cir.1989). The Refuge Act confers broad discretion on the Secretary as to who is permitted to enter refuge lands and for what purposes they are permitted to enter. *See* 16 U.S.C. § 668dd(d)(1)(A). Because the Secretary has discretion to determine who should may enter refuge lands, his disputed actions in this case are not reviewable by the Court.

**14.** The Court wishes to note the fine quality of Intervenor–Defendants' briefs and arguments. The Court did not need to address their arguments to dispose of the case, but nevertheless found them quite persuasive.